IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>BLAKE M. KNIEVEL,<br><br>        Defendant. | 8:16CR350<br><br>FINDINGS AND RECOMMENDATION |

      **THIS MATTER** is before the Court on Defendant Blake M. Knievel's Motion to Suppress. (Filing No. 23.) Mr. Knievel ("Defendant") is charged in a One Count Indictment with Felon in Possession of a Firearm in violation of 18 U.S.C. § 922 (g)(1). (Filing No. 1.) Defendant seeks to suppress all evidence obtained from the July 8, 2016, stop and search of a silver pickup truck in Omaha, Douglas County, Nebraska. (Filing No. 23.)

      The Court held an evidentiary hearing on February 7, 2017. Defendant was present with his attorney, Richard McWilliams. The United States was represented by Assistant United States Attorney Matt Lierman. The Court heard the testimony of Omaha Police Sergeant Jacob Ritonya ("Sgt. Ritonya"). The Court received into evidence Sgt. Ritonya's cruiser video (Exhibit 1) and 911 communication reports. (Exhibit 101.) (Filing No. 29.) A transcript (TR.) of the hearing was prepared and filed on February 21, 2017. (Filing No. 32.) This matter is now deemed fully submitted for disposition.

### BACKGROUND

      On July 8, 2016, Sgt. Ritonya was working uniform patrol. (TR. 3-4.) That evening, an anonymous call was made to 911, reporting prowling activities by an individual armed with an Uzi in the La Quinta Inn parking lot at 104th and Old Maple Road. (TR.4.) Sgt. Ritonya, who was dispatched in response to the call, testified that the prowling individual was described as a white male, wearing a black top and a backwards hat. (TR. 4.) After refreshing his recollection

with his reports, Sgt. Ritonya testified that dispatch also relayed that the party was wearing shorts, carrying an Uzi and looking into vehicles. (TR. 5.)

Sgt. Ritonya did not go directly to the call because one of his fellow officers had stopped a car at 120th and Fort and needed immediate backup. (TR. 5-6.) However, while heading to 120th and Fort to assist the officer with the stopped vehicle, dispatch indicated an "all clear." Therefore, at that time, Sgt. Ritonya proceeded to the call location. (TR. 6.)

Sgt. Ritonya arrived at La Quinta Inn at approximately 1:40 to 1:45 a.m. (TR. 7; Exhibit 1.) Sergeant Pat Davis ("Sgt. Davis") also responded to La Quinta Inn. Sgt. Ritonya testified that within minutes of his arrival at La Quinta Inn, he was informed by dispatch that the suspect had gotten into a silver pickup truck in the area. Sgt. Ritonya proceeded towards the location dispatch provided. (TR. 8.) Sgt. Ritonya checked the hotel parking lot for the vehicle. Finding nothing, he proceeded north on 104th Avenue. While on 104th Avenue, Sgt. Ritonya discovered a silver Toyota pickup truck parked along the side of the road. (TR. 8-9; Exhibit 1.) The Toyota pickup truck was the only silver pickup truck Sgt. Ritonya observed in the area. (TR. 31.) Sgt. Ritonya did not think the vehicle was running, but could recall that it was occupied by two parties. (TR. 9.) At around the time that Sgt. Ritonya was pulling his cruiser behind the Toyota pickup truck, he received another update from dispatch stating that the 911 caller had now reported that the party was armed with a semi-automatic handgun, rather than an Uzi. (TR. 14.) Because they suspected, based on the updates they were receiving from dispatch, that the individuals in the vehicle were armed, Sgt. Ritonya and Sgt. Davis conducted a "felony traffic stop" to extract the occupants from the vehicle. (TR. 9-10.) Sgt. Ritonya deployed his rifle and called the occupants out of the vehicle. (TR. 10.)

The driver immediately complied with Sgt. Ritonya's direction to get out of the vehicle and was handcuffed. The passenger, who was later identified as Defendant, was not as compliant. Therefore, Sgt. Ritonya walked to the passenger side of the vehicle to make sure Defendant did not have any weapons in his hands. (TR. 9-11.) After Sgt. Ritonya approached the passenger-side of the pickup truck, he could see that Defendant did not have a firearm in his hands, but observed that Defendant had a small nylon athletic bag in his lap. (TR. 11.)

2

Defendant also had a checkered backpack strapped around his waist. (TR. 11.) Sgt. Ritonya opened the passenger door of the pickup truck, extracted Defendant from the vehicle, put him on the ground and handcuffed him. (TR. 11-12.) When Defendant was removed from the vehicle, the bags on Defendant's person fell out of the pickup truck. Sgt. Ritonya testified that it was at that time that he discovered that Defendant was dressed in a dark sweatshirt and backwards hat. (TR. 11.)

After the suspects were secured, the officers made a visual sweep of the pickup truck and noticed that there was an open container of alcohol in the center console. (TR. 12.) Due to an open container being an arrestable offense, the officers used a "probable cause" search to look for more evidence of open containers in the vehicle. (TR. 13-14.) The search of the vehicle revealed a firearm behind the driver's seat, which was accessible by the passenger. (TR. 15.) The firearm was a bolt action 20 gauge shotgun with the barrel cut off and it was wrapped in various tapes. (TR. 17.) Sgt. Ritonya testified that this weapon could be confused with an Uzi. (TR. 33.) The officers also searched the backpack that was attached to Defendant and found a bag of shotgun shells. Sgt. Ritonya testified that there may have also been shotgun shells found in the nylon bag that were the same caliber as the shotgun shells found in Defendant's backpack. (TR. 17-18.) In addition, the officers found items in Defendant's backpack that could be associated with prowling, including gloves and a mask. (TR. 32-33.)

On cross-examination, Sgt. Ritonya acknowledged that prior to getting the parties out of the pickup truck, he could not tell what kind of clothing the occupants were wearing, whether any of the occupants were wearing hats or the race of the occupants. (TR. 22.) Sgt. Ritonya also testified that he learned at some point that the 911 call came from a 911 cell phone, which meant it could only dial 911. (TR. 25.)

Sgt. Ritonya testified that Exhibit 101, which was offered at the hearing on this matter, was the computer-aid dispatch ("CAD") reports that came across his computer screen on July 8, 2016. Sgt. Ritonya noted, however, that he was listening to dispatch and not reading his computer screen the night of the incident. (TR. 26-30.) Exhibit 101 shows that four 911 calls

regarding the reported prowler were made on July 8, 2016. Exhibit 101 reflects that the first call was received at 1:29:27 a.m. and relayed the following:

> WM, BACKWARDS BALL CAP, BLK SHIRT, SHORTS, IS LOOKING IN A VEH, HAS AN UZI.

The next call came in at 01:31:35 a.m. and stated:

> IS GETTING INTO A SILV PU, IN FRONT OF AN APT BLDG JE OF CALLER ON 104TH AVE . . . CALLER STATES HE WAS DROPPED OFF BY A SILV HONDA SEDAN, WHICH LEFT THE AREA.

Another call came in at 1:47:56 a.m.:

> UPDATE: THE ANON CALLER ADVISED THAT THE ARMED PARTY IS NOW INSIDE A – SILVER, TOYOTA, PICK-UP TRUCK, 4-DR – (JN) OF LA QUINATA INN. THE VEH IS PARKED ON THE STREET AND THE PARTY IS IN THE PASSENGER SEAT.

The final call, which came in at 1:49:31 a.m., stated:

> THE PARTY IS ARMED WITH A SEMI-AUTOMATIC HANDGUN AND THE VEH IS STILL AT THIS LOCATION.

Sgt. Ritonya testified that he may not have heard the second update because he was on his way to help the other officer. (TR. 34.)

## ANALYSIS

### 1. Stop of the Vehicle

Defendant seeks to suppress all evidence obtained from the July 8, 2016 stop and search of the pickup truck. The Government opposes the motion, asserting that the anonymous caller's eyewitness account was sufficiently reliable to establish reasonable suspicion for the police contact.

4

The Government and Defendant point to two different United States Supreme Court decisions to justify their respective positions. The Government relies on *Alabama v. White,* 496 U.S. 325 (1990), in which the Supreme Court held that an anonymous tip, as corroborated by independent police work, exhibited sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop. In *White*, an anonymous tipster told police that a woman would leave a certain apartment complex at a specified time in a car with its right taillight broken, that the woman would go to a certain motel, and that she would be in possession of about an ounce of cocaine inside a brown attaché case. After the call, officers proceeded to the apartment complex where they observed the car that was described by the caller. There, the officers observed a woman leave a building and get into the car. The officers followed the woman who was headed in the most direct route to the motel that the caller identified. Police stopped the vehicle and the suspect gave officers permission to search the vehicle. During the search, the officers found a locked brown attaché case filled with marijuana.

The Supreme Court found that the anonymous tip, corroborated by independent police work, exhibited sufficient indicia of reliability to provide reasonable suspicion for the police to make the investigatory stop. The Supreme Court made clear that, standing alone, the tip was completely lacking in the necessary indicia of reliability because it provided nothing from which an officer conclude that the caller was honest or reliable, and gave no indication of the basis for the caller's predictions regarding the suspect's criminal activities. However, the Court found that the totality of the circumstances demonstrated that significant aspects of the informant's story were sufficiently corroborated by the police to furnish reasonable suspicion. The Court also noted that the fact that the caller was able to predict the suspect's future behavior demonstrated a special familiarity with her affairs. Thus, "there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop." *White*, 496 U.S. at 332.

Defendant relies on *Florida v. J.L.,* 529 U.S. 266 (2000), in which an anonymous caller reported to police that a young black male, standing at a particular bus stop and wearing a plaid shirt, was carrying a gun. The United States Supreme Court determined that the anonymous tip

5

that the respondent was carrying a gun was insufficient to justify the police officer's stop and frisk of the respondent. The Court found that that the tip lacked the indicia of reliability necessary because the call provided no predictive information to enable the police to test the informant's knowledge and credibility. Further, the Court held that the accurate description of respondent's appearance was not enough to support the stop because the reasonable suspicion at issue required that the tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. The Court also declined to adopt a "firearm exception" to the standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968), under which a tip alleging the presence of an illegal gun would justify a stop and frisk even if the accusation would fail pre-search reliability testing.

The case at hand is distinguishable from both *White* and *J.L.* Here, the anonymous caller appeared to be observing events as they transpired, and then calling back into 911 to provide updates on the situation. In fact, the caller made four separate calls to 911 about the suspect. Thus, the issue presented for this Court is whether the 911 caller's continued eyewitness observation of the suspect and four separate reports to 911 justified the officers' investigatory stop of Defendant.

A United States Supreme Court case providing guidance on this issue is *Navarette v. California*, 134 S.Ct. 1683 (2014). In *Navarette*, the Court found that a motorist's 911 call reporting that a pickup truck had run her off the roadway was sufficiently reliable to provide reasonable suspicion for the subsequent traffic stop of the pickup truck. The 911 caller provided the location where the incident occurred and a specific description of the vehicle, including the plate number. The Supreme Court noted that "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Id.* at 1688 (citing *White*, 496 U.S. at 329). The Court acknowledged, however, that "under appropriate circumstances, an anonymous tip can demonstrate sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop." *Id* (internal quotation omitted). The Court found that by the caller reporting that she had been run off the road by a specific vehicle, "the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving," which provided significant support to

6

the tip's reliability. *Id*. at 1689. The Court stated that this circumstance stood in contrast to *J.L.*, where the tip provided no basis for concluding that the tipster had actually seen the gun.

The Court in *Navarette* noted additional reasons for concluding that the 911 caller was being truthful. The timeline showed that the caller reported the incident soon after she was run off the road. The Court stated that "sort of contemporaneous report has long been treated as especially reliable." *Navarette*, 134 S.Ct. at 1689. The Court further noted that there was no indication that the tip in *J.L.*, or even *White*, was contemporaneous with the observation of criminal activity or made under the stress of excitement caused by a startling event. The Court stated that another indication of the veracity was the caller's use of the 911 emergency system.

The *Navarette* court further stated that a reliable tip only justifies an investigatory stop if it creates reasonable suspicion that "'criminal activity may be afoot.'" *Id*. at 1690 (quoting *Terry v. Ohio,* 392 U.S. 1 (1968)). The Court stated that "[r]easonable suspicion depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id*. at 1690 (internal quotation omitted). The Court made clear that "reasonable suspicion need not rule out the possibility of innocent conduct." *Id*. at 1691 (internal quotation omitted). The Court determined that the 911 caller's report of being run off the roadway created reasonable suspicion of an ongoing crime, as opposed to an isolated episode of past recklessness. The Court stated that once the officer spotted the car, the absence of additional suspicious conduct in the officer's presence did not prevent the officer from making the stop because an officer who already has reasonable suspicion need not surveil a vehicle at length in order to personally observe suspicious driving.

The Eighth Circuit Court of Appeals has also considered issues related to the constitutionality of investigatory stops based on information received from anonymous tipsters. In *Parker v. Chard,* 777 F.3d 977 (8th Cir. 2015),[1] the plaintiff instituted an action under 42 U.S.C. § 1983, asserting that her constitutional rights were violated when she was seized based

---

[1] The Eighth Circuit Court of Appeals could not apply the Supreme Court's decision in *Navarette* when ruling in *Parker* because *Navarette* was not decided until after the seizure involved in *Parker* took place.

7

only on an uncorroborated anonymous tip.  In *Parker*, officers were dispatched to investigate an allegation of shoplifting.  Before leaving the police station, the officers were informed that a "couple of black females" had stolen merchandise from Urban Outfitters, and that an employee from the nearby Heartbreaker store had called to report the suspected shoplifters.  While on their way to the mall, one of the officers contacted the manager at Heartbreaker and was told by the manager that a customer had pointed out several African American females in the store who had recently run from Victoria's Secret.  The officer called Victoria's Secret and confirmed that a group of black females had recently run out of the store.  When the officers arrived at Heartbreaker, the manger pointed to the group of females identified by the customer.  The manger indicated that the customer thought that the group running from Victoria's Secret was suspicious and indicated shoplifting.  The customer who reported this did not leave her name or contact information.  The officers observed the females inside Heartbreaker and did not notice any suspicious activity.  Still, when the group of women was leaving the mall, the officers searched their bags and found nothing.

The Court of Appeals noted that officers may "conduct an investigatory *Terry* stop when, based on the totality of the circumstances, they have "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *Id.* at 980 (internal quotations omitted).  The court stated that for an anonymous tip to give rise to such suspicion, it must be "'suitably corroborated'" and exhibit "'sufficient indicia of reliability.'"  *Id*. (quoting *J.L.*, 529 U.S. at 270).  The Eighth Circuit found that "[t]o demonstrate the reliability of tipsters alleging possession of concealed drugs or guns, *J.L.* and *White* require corroboration of the tips' predictive elements."  *Id*. at 980.  The court noted, however, that the Supreme Court "did not hold that corroboration of predictive elements is the exclusive measure of a tip's reliability."  *Id*.

The Eighth Circuit found that although the tip did not contain any predictive elements that the police could use to test the tipster's reliability, the basis of the customer's knowledge—firsthand observation of readily visible activity—was clear.  The court noted that *White*, focusing on allegations of concealed drug possession, did not address the reliability of this type of eyewitness tip.  The court also pointed out that *J.L.* did not discuss eyewitness tips and that, unlike the officers in *J.L.*, the officers corroborated the part of the tip alleging suspicious activity.

8

The court found that based on *White* and *J.L.*, it was not clearly established that the officers, having corroborated the running asserted in the eyewitness tip, and knowing that shoplifting had recently occurred, could not reasonably suspect Parker of shoplifting. Therefore, the Eighth Circuit held that the defendant officers were entitled to qualified immunity.

In *United States v. Wheat*, 278 F.3d 722 (8th Cir. 2001), the appellant argued that an anonymous 911 call did not give rise to reasonable suspicion sufficient to justify an investigatory stop under *Terry* because the officer never witnessed any traffic violation actually in progress or about to occur. The Eighth Circuit Court of Appeals, in light of *J.L.*, had to decide whether "an anonymous tip about the dangerous operation of a vehicle whose innocent details are accurately described may still possess sufficient indicia of reliability to justify an investigatory stop by a law enforcement officer who does not personally observe any erratic driving." *Wheat*, 278 F.3d at 729. The court found that under the totality of the circumstances, the officer had reasonable suspicion to detain the car in which Wheat was a passenger.

In *Wheat*, an unknown motorist called 911 to report that a tan and cream-colored Nissan Stanza or "something like that," whose license plate began with the letters W-O-C, was being driven erratically in the northbound lane of Highway 169, eight miles south of Fort Dodge, Iowa. The caller stated that the vehicle was passing on the wrong side of the road and cutting off other cars. The 911 operator did not ask the caller to identify himself. Police dispatchers relayed the caller's tip to patrolling officers. Shortly thereafter, an officer observed a tan Nissan Maxima whose license plate began with the letters W-O-C, stopped in the northbound lane of Highway 169. The Nissan made a right turn, and the officer stopped it immediately, without having observed any incidents of erratic driving. The officer got permission from the driver to search the vehicle. The passenger, Wheat, opened his door and exited the vehicle on his own initiative. As an officer approached the passenger side of the vehicle, he noticed a dry brown paper bag from McDonald's at Wheat's feet. The officer retrieved the bag and found that it held four smaller plastic bags containing what appeared to be a controlled substance.

The Eighth Circuit noted that because "reasonable suspicion is a less demanding standard than the probable cause required for an arrest, it can arise from information that is less reliable

9

than that required to show probable cause, including an anonymous tip." *Wheat*, 278 F.3d at 726 (internal quotation omitted). The court stated that "[w]hether an anonymous tip suffices to give rise to reasonable suspicion depends on both the quantity of information it conveys as well as the quality, or degree of reliability, of that information, viewed under the totality of the circumstances." *Id*. "If a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id*.

The Eighth Circuit stated in *Wheat* that subsequent to *White*, with respect to two categories of anonymous tips, "lower courts tended to find reasonable suspicion even where such tips lacked personal corroboration by law enforcement officers of any predictive elements." *Id*. at 727. First, the court pointed out that several federal appellate courts held that "verification by police of the innocent details of a tip, such as the suspect's description, could amount to reasonable suspicion when the principal allegation of the tip was that the suspect was armed with a gun and presented a potentially immediate danger." *Id*. (citing *United States v. Bold*, 19 F.3d 99, 102-04 (2d Cir. 1994); *United States v. DeBerry*, 76 F.3d 884, 885-87 (7th Cir. 1996); *United States v. Gibson*, 64 F.3d 617, 619-25 (11th Cir. 1995). The Eighth Circuit noted that these "courts agreed that the suspect's alleged possession of a firearm was an important factor to be considered in weighing the totality of the circumstances, because the element of imminent danger distinguishes a gun tip from one involving possession of drugs." *Wheat*, 278 F.3d at 727 (internal quotation omitted).

The *Wheat* court went on to state that the second category of tips for which courts declined to require corroboration of their predictive elements concerned situations involving apparently drunk or reckless drivers. The court noted that a number of state supreme and intermediate appellate courts have held that law enforcement officers could pull over a vehicle for an investigatory stop based on a contemporaneous tip of erratic driving that accurately described a given vehicle, even where the officer did not personally witness any moving violations. *Wheat*, 278 F.3d at 728 (citing *State v. Melanson*, 140 N.H. 199, 200-03, 665 A.2d 338, 339-41 (1995); *State v. Sampson*, 669 A.2d 1326, 1327 (Me. 1996); *State v. Lamb*, 168 Vt. 194, 196-203, 720 A.2d 1101, 1102-06 (1998); *State v. Slater*, 267 Kan. 694, 696-706, 986 P.2d

10

1038, 1041-46 (1999)). The court further noted that in addition "to the fact that in the erratic driving context the tipster is almost invariably claiming to describe contemporaneously perceived behavior, courts tended to agree that, as in the gun possession cases, the exigency of the situation demanded an immediate law enforcement response." *Wheat*, 278 F.3d at 728 (internal citation omitted). Still, citing *J.L.*, the Eighth Circuit acknowledged that the Supreme Court "appeared to curtail the argument that a purported threat of imminent danger necessarily lessens the government's burden in an analysis of the reliability of an anonymous tip." *Id*.

In the case at hand, Sgt. Ritonya received a number of transmissions from his dispatcher as a result of someone calling 911. The first call provided a physical and clothing description of a suspect, and informed that the suspect was looking into vehicles in the La Quinta Inn parking lot while armed with an Uzi. Approximately two minutes later, the person called 911 again and indicated that the suspect got into a silver pickup truck in front of an apartment building just east of the caller on 104th Avenue. The 911 caller also stated that the suspect was dropped off by a silver Honda sedan that left the area. The 911 caller called back approximately 16 minutes later, indicating that the armed party was inside a silver, Toyota, pickup truck, 4 door, just north of La Quinta Inn. The caller further provided that the pickup truck was parked on the street and the suspect was in the passenger seat. The last call into 911 came a couple minutes later, indicating that the suspect was armed with a semi-automatic handgun and that the vehicle was still at the location.

The totality of the circumstances in this case show that the anonymous tip had sufficient indicia of reliability to justify the investigatory stop. The 911 caller provided an ethnic description of the suspect, a clothing description of the suspect, movements of the suspect, observation of a firearm and the potential criminal activity of the suspect looking into cars in a hotel parking lot at 1:30 a.m. while holding a firearm. The caller continued to call in with updates, which suggests that the caller was observing what was occurring and was giving contemporaneous updates to 911. In one call, the caller indicated that the suspect got into a silver pickup truck in front of an apartment building just east of the caller's location. The caller described the vehicle that the suspect was in by the color and make, and by stating that the vehicle had 4 doors. The caller later updated the type of weapon observed, again showing

11

contemporaneous observations. Sgt. Ritonya went to the location described by the tipster and found a silver 4-door Toyota pickup truck at the location. (*See* Exhibit 1.) This was the only silver pickup truck in the area. The time between the third and fourth dispatch of information and Sgt. Ritonya's arrival behind the pickup truck was less than 5 minutes. In addition, Sgt. Ritonya arrived at La Quinta Inn within sixteen minutes of the call, and was at the suspect's vehicle within another 3 to 4 minutes. Sgt. Ritonya observed two people in the pickup truck. One individual was in the driver's seat, and the other was in the passenger's seat. Therefore, based on the totality of the circumstances, when Sgt. Ritonya stopped Defendant, the anonymous tip had sufficient indicia of reliability to furnish reasonable suspicion that Defendant was engaged in, or about to be engaged in, criminal activity. Therefore, the investigative stop did not violate the Fourth Amendment and suppression of the evidence is not warranted.

### 2. Defendant's Standing to Challenge the Search of the Vehicle

"Generally, a mere passenger does not have standing to challenge a vehicle search where he has neither a property nor a possessory interest in the automobile." *United States v. Russell, 847 F.3d 616, 618 (8th Cir. 2017*) (quotation omitted). Defendant was not the registered owner of the vehicle, and has presented no evidence that he otherwise had a property or possessory interest in the pickup truck. Therefore, Defendant cannot challenge the search of the vehicle in this case.

### 3. Search of Defendant's backpack and bag

The search of Defendant's backpack and bag was lawful. The officers searched the inside of the vehicle based on an open container that was found in the vehicle. The fact that Defendant's bags had fallen out of the vehicle does not shield them from search. Because the bags were part of the search of the vehicle, and because Defendant cannot challenge the search of the vehicle, the items found within the bags can be used against Defendant.

Moreover, even assuming an appellate court were to find that Defendant could protect the bags from search by bringing them outside the vehicle, suppression would still be improper

12

because the items within the bags would have inevitably been discovered. The inevitable discovery doctrine provides an exception to the exclusionary rule where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *United States v. Craddock,* 841 F.3d 756 (8th Cir. 2016) (citation omitted). In this case, once the firearm was found during the search of the vehicle, Defendant, a convicted felon, would have been arrested. Once he was arrested, a search of all of his belongings would have taken place and the shotgun shells would have been found. Therefore, the search of Defendant's bags did not violate his Fourth Amendment rights.

Accordingly,

**IT IS HEREBY RECOMMENDED TO UNITED STATES DISTRICT COURT JUDGE ROBERT F. ROSSITER, Jr. that:**

Defendant's Motion to Suppress (Filing No. 23) be denied.

### ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 22nd day of March, 2017.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge